**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 6:12-cv-141-LED |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| ORACLE CORPORATION et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' FIRST AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS
TO FIRST AMENDED COMPLAINT**

### A.  ANSWER

Defendants Oracle Corporation and Oracle OTC Subsidiary LLC f/k/a Art Technology Group, LLC (collectively "Oracle"); Best Buy Co., Inc. and BestBuy.com, LLC (collectively "Best Buy"); Neiman Marcus, Inc., The Neiman Marcus Group, Inc., and BergdorfGoodman.com, LLC (collectively "Neiman Marcus"); and OfficeMax, Inc. ("OfficeMax") (collectively "Defendants"), though their undersigned attorneys, hereby provide the following First Amended Answer, Defenses and Counterclaims in response to the allegations in Plaintiff's First Amended Complaint (Dkt. No. 40):

### INTRODUCTION

1.    Paragraph 1 consists of legal assertions to which no response is required. Defendants deny that they infringe the patents-in-suit.

2.      Defendants lack sufficient knowledge regarding the allegations in paragraph 2 and deny them on that basis.

3.      Oracle admits the allegations in paragraph 3.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 3 and deny them on that basis.

4.      Best Buy admits the allegations in the first sentence of paragraph 4.  With regard to the second sentence of paragraph 4, Best Buy states that BestBuy.com, LLC is a limited liability company organized and existing under the laws of the state of Virginia with its principal place of business at 7601 Penn Avenue South, Richfield, Minnesota 55423 and is an indirect subsidiary of Best Buy Co., Inc.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 4 and deny them on that basis.

5.      Neiman Marcus admits the allegations in paragraph 5.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 5 and deny them on that basis.

6.      OfficeMax admits the allegations in paragraph 6.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 6 and deny them on that basis.

<u>JURISDICTION AND VENUE</u>

7.      Defendants admit that this Court has subject matter jurisdiction.

8.      Paragraph 8 consists of legal assertions to which no response is required. Defendants admit that this Court has personal jurisdiction over each Defendant.  Defendants deny the remaining allegations in paragraph 8.

9.      Paragraph 9 consists of legal assertions to which no response is required. Defendants admit that the other cases listed in paragraph 9 were filed and litigated in this District. Defendants deny that this District is a convenient forum in which to litigate this case.  To the

extent that paragraph 9 contains additional factual allegations, as opposed to legal conclusions and argument, Defendants deny the same.

10.     Oracle admits that it develops and sells e-commerce software.  Defendants deny the remaining allegations in paragraph 10.

## THE PATENTS-IN-SUIT

11.     Defendants admit that the '314 patent entitled "Network Sales System" was issued by the USPTO on February 3, 1998; that the USPTO issued a reexamination certificate for the '314 patent on October 9, 2007; that Exhibit A is a copy of the '314 patent; and that Exhibit B is a copy of the reexamination certificate.  Defendants lack sufficient knowledge regarding the remaining allegations in paragraph 11 and deny them on that basis.

12.     Defendants admit that the '492 patent entitled "Network Sales System" was issued by the USPTO on June 1, 1999; that the USPTO issued a reexamination certificate for the '492 patent on August 7, 2007; that Exhibit C is a copy of the '492 patent; and that Exhibit D is a copy of the reexamination certificate.  Defendants lack sufficient knowledge regarding the remaining allegations in paragraph 12 and deny them on that basis.

13.     Defendants lack sufficient knowledge regarding the allegations in paragraph 13, which does not identify the referenced Soverain product, and deny them on that basis.

## COUNT I:  ALLEGED INFRINGEMENT BY ORACLE

14.     Oracle denies the allegations in paragraph 14.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 14 and deny them on this basis.

15.     Oracle admits that some of its customers, including the customers named in paragraph 15, use its software products to implement e-commerce websites and sales systems.

Oracle and the remaining Defendants deny the remaining allegations in paragraph 15.

16.     Defendants admit that their respective websites may be used to search for and place orders to purchase products.  Each Defendant lacks sufficient knowledge regarding the allegations directed to the other Defendants' respective websites and denies them on that basis. Defendants deny the remaining allegations in paragraph 16.

17.     Oracle does not, at this time, have sufficient information to confirm the allegations in paragraph 17 regarding communications between Open Market, Inc. and Art Technology Group, Inc. in 2001 or thereafter and, therefore, denies the same.  Oracle admits that Soverain previously has asserted the '314 patent and '492 patent against other companies. Oracle admits that it received notice of Soverain's Complaint on or near March 14, 2012.  Oracle denies the remaining allegations in paragraph 17.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 17 and deny them on that basis.

18.     Oracle denies the allegations in paragraph 18.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 18 and deny them on this basis.

19.     Defendants deny the allegations in paragraph 19.

20.     Oracle incorporates its answer to paragraph 17, above.  Oracle denies the remaining allegations in paragraph 20.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 20 and deny them on this basis.

21.     Oracle denies the allegations in paragraph 21.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 21 and deny them on that basis.

22.     Oracle denies the allegations in paragraph 22.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 22 and deny them on that basis.

## COUNT II:  ALLEGED INFRINGEMENT BY BEST BUY

23.     Best Buy denies the allegations in paragraph 23.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 23 and deny them on that basis.

24.     Best Buy denies the allegations in paragraph 24.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 24 and deny them on that basis.

25.     Best Buy admits that Soverain previously has asserted the '314 patent and '492 patent against other companies.  Best Buy admits that it received notice of Soverain's Complaint on or near March 14, 2012.  Best Buy denies the remaining allegations in paragraph 25.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 25 and deny them on that basis.

26.     Best Buy denies the allegations in paragraph 26.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 26 and deny them on that basis.

27.     Best Buy denies the allegations in paragraph 27.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 27 and deny them on that basis.

28.     Best Buy denies the allegations in paragraph 28.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 28 and deny them on that basis.

29.     Best Buy denies the allegations in paragraph 29.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 29 and deny them on that basis.

## COUNT III:  ALLEGED INFRINGEMENT BY NEIMAN MARCUS

30.     Neiman Marcus denies the allegations in paragraph 30.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 30 and deny them on that basis.

31.     Neiman Marcus denies the allegations in paragraph 31.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 31 and deny them on that basis.

32.     Neiman Marcus admits that Soverain previously has asserted the '314 patent and '492 patent against other companies.  Neiman Marcus admits that it received notice of Soverain's Complaint on or near March 14, 2012.  Neiman Marcus denies the remaining allegations in paragraph 32.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 32 and deny them on that basis.

33.     Neiman Marcus denies the allegations in paragraph 33.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 33 and deny them on that basis.

34.     Neiman Marcus denies the allegations in paragraph 34.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 34 and deny them on that basis.

35.     Neiman Marcus denies the allegations in paragraph 35.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 35 and deny them on that basis.

36.     Neiman Marcus denies the allegations in paragraph 36.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 36 and deny them on that basis.

## COUNT IV:  ALLEGED INFRINGEMENT BY OFFICE MAX

37.     OfficeMax denies the allegations in paragraph 37.  The remaining Defendants

lack sufficient knowledge regarding the allegations in paragraph 37 and deny them on that basis.

38.     OfficeMax denies the allegations in paragraph 38.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 38 and deny them on that basis.

39.     OfficeMax admits that Soverain previously has asserted the '314 patent and '492 patent against other companies.  OfficeMax admits that it received notice of Soverain's Complaint on or near March 14, 2012.  OfficeMax denies the remaining allegations in paragraph 39.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 39 and deny them on that basis.

40.     OfficeMax denies the allegations in paragraph 40.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 40 and deny them on that basis.

41.     OfficeMax denies the allegations in paragraph 41.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 41 and deny them on that basis.

42.     OfficeMax denies the allegations in paragraph 42.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 42 and deny them on that basis.

43.     OfficeMax denies the allegations in paragraph 43.  The remaining Defendants lack sufficient knowledge regarding the allegations in paragraph 43 and deny them on that basis.

PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief in its Prayer for Relief.

## B.  DEFENSES

Defendants incorporate by reference, as if set forth fully herein, the admissions, allegations, and denials contained in their Answer above.  Defendants reserve all defenses under the Federal Rules of Civil Procedure and United States patent laws, and any other defenses, at law or in equity, that may now exist or be available in the future based on discovery and further factual investigation.  Defendants allege and assert the following affirmative defenses in response to Plaintiff's First Amended Complaint, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein:

### FIRST DEFENSE

Plaintiff has failed to state a claim upon which relief can be granted including, without limitation, a failure of its patents to claim patentable subject matter under 35 U.S.C. § 101 and a failure to plead adequately its claims for indirect infringement with respect to each of the Defendants.

### SECOND DEFENSE

Defendants have not infringed and are not infringing, willfully or otherwise, any valid and enforceable claim of the patents-in-suit, either directly or indirectly, literally or under the doctrine of equivalents.

### THIRD DEFENSE

Each claim of the patents-in-suit is invalid for failing to satisfy one or more requirements of the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

### FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under principles of equity, including prosecution laches, waiver, estoppel, prosecution history estoppel, and/or unclean hands.

### FIFTH DEFENSE

Plaintiff's claims for patent infringement are precluded, in whole or in part: (i) to the extent that any allegedly infringing products or services are supplied, directly or indirectly, to Defendants by an entity or entities that have express or implied licenses to the asserted patents, and/or (ii) under the doctrine of patent exhaustion.

### SIXTH DEFENSE

Plaintiff is barred from recovering damages and other remedies, in whole or in part, by 35 U.S.C. §§ 286 and 287.  Plaintiff is also barred by 35 U.S.C. § 288 from recovering costs associated with this action.

### SEVENTH DEFENSE

Plaintiff is not entitled to injunctive relief because any alleged injury to Plaintiff is not immediate and/or irreparable, and Plaintiff has an adequate remedy at law.

### EIGHTH DEFENSE

Plaintiff cannot prove that this is an exceptional case under 35 U.S.C. § 285; therefore, Plaintiff is not entitled to recover attorney's fees.

### NINTH DEFENSE

Assuming Plaintiff's allegations in paragraph 17 are true, Plaintiff's claims are barred, in whole or in part, under the doctrine of laches.

**TENTH DEFENSE**

The '314 and '492 patents (the "Asserted Patents") are each unenforceable due to inequitable conduct by Andrew C. Payne ("Payne"), Lawrence C. Stewart ("Stewart"), and G. Winfield Treese ("Treese") (collectively, the "Applicants"), alone and in cooperation with each other and with specific others at Open Market, Inc.  Open Market and the Applicants obtained the Asserted Patents by deliberately and fraudulently withholding highly relevant and material prior art from the United States Patent and Trademark Office ("Patent Office") during the prosecution of those patents.  Because Plaintiff must have acquired any interest it might own in the Asserted Patents directly or indirectly from the original assignee(s), the aforementioned acts of inequitable conduct necessarily must inure to the detriment of Plaintiff.  Defendants incorporate by reference herein the allegations in their Third Counterclaim below.


**C.   COUNTERCLAIMS**

Defendants and Counterclaim-Plaintiffs Oracle Corporation; Oracle OTC Subsidiary LLC f/k/a Art Technology Group, LLC; Best Buy Co., Inc.; BestBuy.com, LLC; Neiman Marcus, Inc.; The Neiman Marcus Group, Inc.; and BergdorfGoodman.com, LLC (collectively "Counterclaim-Plaintiffs"), for their Counterclaims against Plaintiff and Counterclaim-Defendant Soverain Software LLC ("Soverain"), allege as follows:

PARTIES, JURISDICTION, AND VENUE

1.      Oracle Corporation is a Delaware corporation with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065.

2.      Oracle OTC Subsidiary LLC f/k/a Art Technology Group, LLC is a Delaware

10

limited liability company with its principal place of business at 500 Oracle Parkway, Redwood Shores, California 94065.

3.      Best Buy Co., Inc. is a Minnesota corporation with its principal place of business at 7601 Penn Avenue South, Richfield, Minnesota 55423.

4.      BestBuy.com, LLC is a Virginia limited liability company with its principal place of business at 7601 Penn Avenue South, Richfield, Minnesota 55423.

5.      Neiman Marcus, Inc. is a Delaware corporation with its principal place of business at 1618 Main Street, Dallas, Texas 75201.

6.      The Neiman Marcus Group, Inc. is a Delaware corporation with its principal place of business at 1618 Main Street, Dallas, Texas 75201.

7.      BergdorfGoodman.com, LLC is a Delaware limited liability company with its principal place of business at 1618 Main Street, Dallas, Texas 75201.

8.      Upon information and belief, Soverain Software LLC ("Soverain") is a Delaware limited liability company with its principal place of business at 233 South Wacker Driver, Suite 9425, Chicago, Illinois 60606.

9.      These counterclaims seeking a declaratory judgment of invalidity and non-infringement arise under the patent laws of the United States, Title 35 of the United States Code, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

### FIRST COUNTERCLAIM – DECLARATION OF NON-INFRINGEMENT

10.     Counterclaim-Plaintiffs incorporate by reference herein each of the allegations above.

11.     Soverain has accused Counterclaim-Plaintiffs of infringing, directly and indirectly,

one or more claims of U.S. Patents 5,715,314 and 5,909,492 (the "patents-in-suit").

12.     Counterclaim-Plaintiffs have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the patents-in-suit, either literally or under the doctrine of equivalents.

13.     An actual controversy exists between Counterclaim-Plaintiffs and Soverain with respect to the non-infringement of the patents-in-suit.

14.     A judicial declaration is necessary and appropriate for Counterclaim-Plaintiffs to ascertain their rights in relation to the non-infringement of the patents-in-suit.

15.     Counterclaim-Plaintiffs seek a declaratory judgment that they have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the patents-in-suit, either literally or under the doctrine of equivalents.

<u>SECOND COUNTERCLAIM – DECLARATION OF INVALIDITY</u>

16.     Counterclaim-Plaintiffs incorporate by reference herein each of the allegations above.

17.     In accusing Counterclaim-Plaintiffs of infringing the patents-in-suit, Soverain has taken the position that one or more claims of the patents-in-suit are valid and enforceable.

18.     None of the claims of the patents-in-suit is valid and enforceable for failing to satisfy one or more requirements of the Patent Act, 35 U.S.C. § 1 *et seq.*, including, but not limited to, the conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

19.     An actual controversy exists between Counterclaim-Plaintiffs and Soverain with respect to the validity of the patents-in-suit.

20.     A judicial declaration is necessary and appropriate for Counterclaim-Plaintiffs to

ascertain their rights in relation to the invalidity of the patents-in-suit.

21.     Counterclaim-Plaintiffs seek a declaratory judgment that none of the claims of the patents-in-suit is valid and enforceable for failing to satisfy one or more requirements of the Patent Act, 35 U.S.C. § 1 *et seq.*, including, but not limited to, the conditions of patentability set forth in 35 U.S.C. §§ 101, 102, 103 and/or 112.

<u>THIRD COUNTERCLAIM – DECLARATION OF UNENFORCEABILITY</u>

22.     Counterclaim-Plaintiffs incorporate by reference herein each of the allegations above.

23.     The '314 and '492 patents (the "Asserted Patents") are each unenforceable due to inequitable conduct by Andrew C. Payne ("Payne"), Lawrence C. Stewart ("Stewart"), and G. Winfield Treese ("Treese") (collectively, the "Applicants"), alone and in cooperation with each other and with specific others at Open Market, Inc., as set forth below. Open Market and the Applicants obtained the Asserted Patents by deliberately and fraudulently withholding highly relevant and material prior art from the United States Patent and Trademark Office ("Patent Office") during the prosecution of those patents. Because Plaintiff must have acquired any interest it might own in the asserted patents directly or indirectly from the original assignee(s), the aforementioned acts of inequitable conduct necessarily must inure to the detriment of Plaintiff.

24.     The application that resulted in the '314 patent, namely U.S. Patent Application Serial No. 08/328,133 (the "'314 application"), was filed on October 24, 1994. When the '314 application was filed, the Applicants were employed by a company named Open Market, which was the original assignee of the Asserted Patents. The application that resulted in the '492 patent,

namely U.S. Patent Application Serial No. 08/878,396 (the "'492 application"), was filed on June 18, 1997, and was filed as a continuation application of the '314 application with essentially the same disclosure.

25.     As discussed in their "summary of the invention" section, the '314 and '492 applications are directed to "a network-based sales system that includes at least one buyer computer for operation by a user desiring to buy products, at least one shopping cart computer, and a shopping cart database connected to the shopping cart computer."  Among other things, the '314 and '492 applications included claims directed to an implementation of an online "shopping cart" for accumulating products for possible purchase.

26.     Before filing the '314 application, the Applicants were aware of prior art systems offered by other e-commerce software providers and website operators.  For example, Andrew Payne circulated an e-mail to others at Open Market, months before filing the '314 application, stating that the website "HotHotHot" had an "implementation of shopping carts."  In at least two cases (NetMarket and Internet ShopKeeper), Payne characterized the competing websites— prima facie prior art that was already on the market—as equal to what Open Market was trying to do.

27.     While concealing their knowledge about competitors who had beaten them to the market with online shopping carts and other e-commerce technologies that they eventually claimed in the '314 and '492 patents, Open Market and the Applicants disclosed dozens of less relevant prior art references to the Patent Office during the prosecution of the '314 and '492 applications, none of which mentioned anything about online "shopping carts," "shopping cart databases," or "shopping cart computers."

14

28.    The Applicants knew that any prior art about online shopping carts would be highly relevant to the shopping cart claims they were seeking to patent in the '314 and '492 applications.  For example, soon after the '314 patent issued, Treese publicly discussed his views of the wide scope of the patent's claims, saying that "[t]he shopping cart claims are very general and very broadly focused."  *See*, *e.g.*, http://www.zdnet.com/news/open-market-wins-critical-patents/98721.

29.    Patent applicants are required to prosecute patent applications with candor, good faith, and honesty.  An applicant's breach of this duty, when coupled with intent to deceive or mislead the Patent Office, constitutes inequitable conduct, which renders the patent unenforceable.  As described below, the Applicants breached those duties by failing to disclose at least the following material prior art to the Patent Office with the intent to deceive the Patent Office:

    a.  HotHotHot Website

    b.  NetMarket Website

    c.  Condom Country Website

    d.  Trewitt Paper and the Future Fantasy Bookstore Website

    e.  Stuff.com Website

    f.  Internet ShopKeeper

    g.  First Virtual System

### a.  The HotHotHot Website

30.    By May 1994, a company called Altadena began work on a website called "HotHotHot" to sell hot sauce over the Internet.  By July 1994, Altadena had developed a way to

maintain "state" using session IDs in URLs, a key element of the '314 patent.  By September 1994, the HotHotHot website had gone live and was processing hot sauce orders over the Internet.  The website allowed a user to browse different hot sauces, decide which ones to buy, place the chosen items in a shopping cart, and purchase the items over the Internet.  The HotHotHot website maintained state over the course of a user's session by placing a session identifier in the URL.

31.      The HotHotHot website was in public use in September 1994, before the Applicants filed the '314 application on October 24, 1994.  The operation of the HotHotHot website as it existed in September 1994 is evidenced by its source code from that time, which was maintained in a revision control system and produced in a previous lawsuit brought by Plaintiff and, upon information and belief, has been reconstructed by one or more defendants previously sued by Soverain.

32.      The materiality of the HotHotHot website to the shopping cart claims that the Applicants later attempted to patent was obvious in view of the layout and functionality of the website, which included at least the following:  maintaining state by virtue of a session identifier in a URL; an on-line "catalog" of products; invitations to the user to place products in the shopping cart by pressing the "Order" button; the ability to order a plurality of different items; order forms confirming the contents of the customer's shopping cart; the ability to submit the order on-line by clicking a "Send Order" button; and the ability to process the order by entering a credit card number and shipping information.

33.      The Applicants knew about HotHotHot and its shopping cart technology well before they filed the '314 patent application.  For example, on September 29, 1994,

16

approximately one month before filing its '314 "shopping cart" application, Applicant Payne

sent an e-mail to <u>tech@openmarket.com</u>, stating that the HotHotHot website contained "one

implementation of shopping carts" and that it appeared to use session identifiers embedded in a

URL.  On information and belief, Payne, Stewart, and Treese received this September 29, 1994

message.

34.     Upon information and belief, by October 24, 1994, before the '314 "shopping cart"

application was filed, Payne, Stewart, and Treese each had knowledge that the HotHotHot

website had an implementation of an online shopping cart that disclosed fundamental elements

of the "inventions" described in the Asserted Patents.

35.     On information and belief, at least by October 24, 1994, when the '314 "shopping

cart" application was filed, at least Payne had personally navigated through the HotHotHot

website and tested some or all of its features, including (in his own words) its "implementation

of shopping carts."

36.     Because the HotHotHot website included an implementation of online shopping

carts, it was material to the patentability of one or more claims of the '314 patent and the '492

patent, including, for example, '314 patent claim 34 and the '492 patent claim 17.

37.     The HotHotHot website was at least prima facie prior art that should have been

disclosed to the Patent Office because it would have resulted in the amendment or rejection of

claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent

Office, including, for example, the claims that issued as '314 patent claim 34 and '492 patent

claim 17.

38.     The materiality of the HotHotHot prior art is exemplified by the following chart, which compares original claim 34 of the '314 patent to the shopping experience disclosed by the HotHotHot electronic store:

| U.S. Patent No. 5,715,314 Original Claim 34 | Prior Art "HotHotHot" Website |
|---|---|
| 34. A network-based sales system, comprising: | By May 1994, a company called Altadena began work on a website known as " HotHotHot" to sell hot sauces over the Internet.  By late September 1994, the HotHotHot website went live and started to take orders for hot sauce over the Internet.  The website allowed a user to browse different hot sauces, decide which ones to buy, place them in a shopping cart, and purchase the items over the Internet. |
| at least one buyer computer for operation by a user desiring to buy products; | Anyone with a credit card and a compatible web browser, such as Netscape, could visit the HotHotHot website to buy hot sauce. |
| at least one shopping cart computer; and | The HotHotHot website server hosted the store website and permitted customers to select products to buy, which products were stored in a virtual shopping cart. |
| a shopping cart database connected to said shopping cart computer; | The HotHotHot store website stored the products the customer had selected and could display them on an "Order Form" page that displayed the contents of the products the user had selected during her visit on the website. |
| said buyer computer and said shopping cart computer being interconnected by a computer network; | Users could buy hot sauce products at the HotHotHot electronic store by using the World Wide Web. |

| U.S. Patent No. 5,715,314 Original Claim 34 | Prior Art "HotHotHot" Website |
|---|---|
| said buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in said shopping cart database, and, in response to said requests to add said products, to send a plurality of respective shopping cart messages to said shopping cart computer each of which comprises a product identifier identifying one of said plurality of products; | Once at the HotHotHot website, the user could simply click a few buttons to add different uniquely-identified hot sauce products to her virtual shopping cart.  The buyer could add different products one at a time, communicating with the HotHotHot store's web server over the Internet each time. |
| said shopping cart computer being programmed to receive said plurality of shopping cart messages, to modify said shopping cart in said shopping cart database to reflect said plurality of requests to add said plurality of products to said shopping cart, and to cause a payment message associated with said shopping cart to be created; and | The HotHotHot electronic store modified the buyer's shopping cart to reflect each addition and deletion from her shopping cart.  When the buyer was ready to checkout, the HotHotHot website presented her with a convenient summary of her order and an invitation to click a button to "Send Order." |
| said buyer computer being programmed to receive a request from said user to purchase said plurality of products added to said shopping cart and to cause said payment message to be activated to initiate a payment transaction for said plurality of products added to said shopping cart. | Having selected the hot sauce products she wished to buy, the customer in the HotHotHot electronic store would use her computer to pay for her goods, receiving in turn a confirmation of her order and the total amount paid, as shown in the screen captures above. |

39.     On information and belief, one or more of the Applicants withheld information about HotHotHot, the HotHotHot website, their own use and testing of the HotHotHot website, and that website's implementation of shopping carts from their patent attorney working on the

'314 and '492 applications.  The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

40.     The HotHotHot website was not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 applications.  While aware of the existence of other websites employing online shopping carts, Payne, Stewart, and Treese did not disclose any prior art to the Patent Office discussing online shopping carts during the prosecution of the '314 and '492 applications.

41.     Payne, Stewart, and Treese committed inequitable conduct by not disclosing information about the HotHotHot website and its public use to the Patent Office during the prosecution of the Asserted Patents.  Each of these individuals knew or demonstrated willful blindness to the fact that the HotHotHot website was a material reference, but withheld it from the Patent Office with intent to deceive, in violation of their sworn oaths.  On information and belief they did so knowingly to obtain patent claims that they knew were not novel and would not have issued had there been disclosure of the foregoing information.

42.     The evidence of the Applicants' knowledge of the HotHotHot website and its obvious materiality compels a reasonable inference of intent to deceive and is incompatible with any innocent explanation for their failure to disclose.

43.     The Applicants' withholding from the Patent Office of their information about HotHotHot, the HotHotHot website, their own use and testing of the HotHotHot website, and that website's implementation of shopping carts renders the '314 and '492 patents unenforceable.

### b.  The NetMarket Website

44.     Beginning in January 1994, a company called NetMarket created a demonstration version of a website that included something called a "shopping list."  In March 1994, NetMarket developed session IDs to keep track of items in users' shopping lists.  In April 1994, NetMarket made a version of its website that allowed users to go through the entire ordering process including selecting items to place in the users' shopping lists.  This test version of the NetMarket website allowed a user to add music CDs to a shopping list and then to pretend to go through the process of actually purchasing them.

45.     By July 1994, NetMarket had completed a working version of its website that included the final step of actually purchasing the accumulated items.  A user visiting the NetMarket website at www.netmarket.com by July 1994 could purchase music CDs from Noteworthy Music using his or her credit card.  The NetMarket website also used a session identifier embedded in a uniform resource locator ("URL") as part of its way of handling these transactions.  This version maintained state over the course of a user's session by using session IDs.  It allowed a user to add items to a shopping list and it permitted the user to purchase those items over the Internet.

46.     For example, an e-mail dated July 25, 1994 from Josh Smith to comments@netmarket.com described how Mr. Smith, while testing the NetMarket website, actually added an item to a "shopping list":

The second is easy to reproduce. From the Shopping page, I select Wish List.
From there, I move something from my Wish List to my Shopping List. At this point, I
expect 'Back' to take me back to the Shopping page, but instead it reloads the Wish List
page (containing exactly the same data, i.e. correctly including the change I just made).
Doing 'Back' again does bring me back to the Shopping page; the first couple of times I
noticed this, I thought I'd just clicked in the wrong place or something.

47.     The NetMarket website was the subject of a <u>New York Times</u> article published on August 12, 1994 (more than two months before the '314 application was filed), titled: "Attention Shoppers: Internet is Open, and Secure."  Describing a customer who used the NetMarket website to purchase music, the article stated, in part, that "At noon Thursday, Phil Brandenberger of Philadelphia went shopping for a compact audio disk, paid for it with his credit card and made history."  The article also noted that "Net Market [sic] has been selling various products like CD's, flowers and books for several months on behalf of various merchants."

48.     Upon information and belief, the same day that this <u>New York Times</u> article was published (August 12, 1994), its full text was circulated throughout Open Market in an e-mail acknowledging that NetMarket "sounds like a very real competitor to Open Market," and noting that Open Market would "need to keep this little company in mind as we develop positioning, a competitive matrix, etc."

49.     Upon information and belief, Applicant Payne became aware of the NetMarket website at least by June 15, 1994, when he examined the website located at http://www.netmarket.com.  Payne notified Stewart about it that day, sending an e-mail to stewart@openmarket.com and stating in relevant part:

> Check out:  http://www.netmarket.com/about.html
> There's an item about security and how they take credit card numbers, host based access control, etc.

50.     Upon information and belief, the following month, on July 16, 1994 (three months before it filed the '314 application), Andrew Payne sent an e-mail to tech@openmarket.com with the subject line "Competitor."  This e-mail stated that competitor

NetMarket's "on-line" system already in the marketplace looked "almost exactly like" the

demonstration system that Open Market was in the process of developing:

> Take a look again at:
> http://www.netmarket.com/
> They've done a lot of work in the past few weeks. Their on-line system
> looks almost exactly like our demo system!!

51.     Upon information and belief, on or about July 1, 1994, Payne copied the HTML

source code for the home page of http://www.netmarket.com into Open Market's own source

code "Revision Control System."

52.      Upon information and belief, on July 18, 1994, Payne wrote a "punch list from

the July 15th demo."  The list included the following to-do item:  "write/steal PostScript for

making inlined image buttons (like Netmarket) …."  The term "inlined image button" as used by

Payne in his to-do document refers to an image presented to a computer user (namely, in this

context, a consumer seeking to purchase products over the Internet) that looks and acts like a

button in the physical world.  For example, a user can click on a button that is labeled with some

useful text, like "Purchase This Item" or "Add to Shopping List."  "PostScript" refers to a

programming language for specifying the layout of documents.

53.     Upon information and belief, on or about July 20, 1994, Payne sent an e–mail to

Gail Grant at the address grant@pa.dec.com about the NetMarket website.  In this e-mail, Payne

admitted to watching NetMarket and referred to the Netmarket website as "the closest to what

we're doing":

> Have you looked at Netmarket (www netmarket com)?  I've been
> watching them, and of anyone I've seen, they're the closest to what we're
> doing They capture credit card info, have a way of composing orders, have
> plans to use PGP for encrypting stuff have a restricted version of Lynx

that you can telnet to browse their stuff, etc., etc. It looks like they are on the ball . . . .

54.     Upon information and belief, on or about March 17, 1995, an Open Market employee sent an electronic mail message to all@openmarket.com that included the following text:

>> After reading yesterday's news about NetMarket I decided to re-visit. While there I noticed they seem to have a primitive session ID system which tracks which pages people visit. No error checking seems to be done on this field (which is even called sid in the url) since I was able to change it and the page happily reloaded. See: http://netmarket.con/nm/pages/demoinfo?sid=Qw8aJtLc4b.

[perry]

55.     Upon  information and belief, before filing the '314 application, Payne, Stewart, and Treese each knew that NetMarket had operated by July 1994 a website through which customers could add items to their shopping lists and then make purchases using the Internet.

56.     Upon information and belief, Payne, Stewart, and Treese knew that the NetMarket website technology predated and closely competed with what they were seeking to patent in the '314 and '492 applications.

57.     Upon information and belief, at least by October 24, 1994, when the '314 "shopping cart" application had been filed, Payne, Stewart, and Treese had knowledge that the NetMarket website included an implementation of an online shopping cart.

58.     Upon information and belief, at least by October 24, 1994, when the '314 "shopping cart" application was filed, at least Payne had personally navigated through the NetMarket website and tested some or all of its features.

59.     Because the NetMarket website implemented shopping cart functionality, it was material to the patentability of one or more claims of the '314 patent and the '492 patent, including, for example, '314 patent claim 34 and the '492 patent claim 17.

60.     The NetMarket website was at least prima facie prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of claims in the '314 and '492 applications that Open Market was seeking to obtain in the Patent Office, including, for example, the claims that issued as '314 patent claim 34 and '492 patent claim 17.

61.     On information and belief, Payne, Stewart, and Treese withheld information about NetMarket, the NetMarket website, their own use and testing of the NetMarket website, and that website's implementation of shopping carts from their patent attorney working on the '314 and '492 applications.  The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

62.     The NetMarket website was not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 applications.

63.     Payne, Stewart, and Treese committed inequitable conduct by not disclosing information about the NetMarket website and its public use to the Patent Office during the prosecution of the '314 and '492 applications.  On information and belief, each of these individuals knew that the NetMarket website was a material reference, but withheld it with intent to deceive, as evidenced by their knowledge of the website, identification of NetMarket as a primary competitor, and the website's publicly displayed functionality, which included  a shopping list analogous to a shopping cart, user identification methodologies, and internet

commerce functionality.  The foregoing creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for their failure to disclose.

64.    The Applicants' withholding from the Patent Office of their information about NetMarket, the NetMarket website, their own use and testing of that website, and that website's implementation of shopping carts renders the '314 and '492 patents unenforceable.

### c. The Condom Country Website

65.    In 1994, Albert Coulson, Frank Leibly, Andrew Heitner, and Bob Ramstad, who at the time were all students or graduates of MIT, created a technology company called the New Frontiers Information Corporation ("NFIC").  No later than June 1994, they had developed technology for building and operating e-commerce websites that would sell products over the Internet.  To illustrate their technology, they created a functioning website operated under the trade name "Condom Country" at the URL http://www.ag.com/condom/country.  The successor to this website is still in operation today at the URL http://www.condom.com.

66.    Upon information and belief, on September 26, 1994, Christian Hamer, NFIC's first employee, announced the opening of Condom Country in a post to the public Usenet newsgroup comp.infosystems.www.misc.

67.    When the Condom Country website was launched in September 1994, a visitor to the website would have seen that the site allowed a user to browse items, select items, add and remove items in a "shopping bag," and purchase those items.

68.    The operation of the Condom Country website as it existed in September 1994 is evidenced by its source code from that time, which was maintained in a revision control system and produced in a previous lawsuit brought by Plaintiff.  Upon information and belief, the

website, as it existed in September 1994, has been reconstructed by another Soverain defendant using that source code, allowing one to see what a customer visiting the website would have seen in September 1994.

69.     One of the developers of the Condom Country website, Bob Ramstad, has confirmed under oath that the Condom Country website in September 1994 used shopping cart functionality to store items selected by a user.

70.     Upon information and belief, the Applicants learned about the Condom Country website within just a few days of its grand opening of September 26, 1994, and even added it to Open Market's own index of e-commerce websites.  On September 29, 1994, Payne wrote an e-mail to Kim Alley at Open Market noting that he had updated the listing for the "Condom Country" website in the Commercial Sites Index that Open Market maintained.  Referring to the Index, Payne wrote:  "By the way, we've got a new entry under 'sex' (Condom Country).  Didn't you know someone who wanted to sell condoms on the Internet?  Anyway, I had to make a little editorial decision to remove some explicit wording from their what's new announcement."

71.     Upon information and belief, on or about October 2, 1994, Payne received an e-mail from Henry Houh that stated:  "On another issue, do you suppose you will have HTML markup stuff to spin off?  I am thinking of this new company 'nfic.com' that now has their own Tl. They're a bunch of MIT folk, (they did the condoms company)."

72.     On information and belief, at least by October 24, 1994, when the '314 "shopping cart" application was filed, at least Payne had personally navigated through the Condom Country website and tested some or all of its features.

73.     On information and belief, at least by October 24, 1994, when the '314 "shopping cart" application was filed, Payne, Stewart, and Treese had knowledge that the Condom Country website had an implementation of an online shopping cart.

74.     Because the Condom Country website implemented an online shopping cart, it was material to the patentability of one or more claims of the '314 patent and the '492 patent, including, for example, '314 patent claim 34 and the '492 patent claim 17.

75.     The Condom Country website was at least prima facie prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent Office, including, for example, the claims that issued as '314 patent claim 34 and '492 patent claim 17.

76.     The claim chart below illustrates the materiality of the Condom Country prior art reference by an exemplary mapping to '492 claim 17:

| U.S. Patent No. 5,909,492 Claim 17 | Prior Art "Condom Country" Website |
| --- | --- |
| 17. A network-based sales system, comprising: | Condom Country is a business that was originally operated by New Frontiers Information Corporation (hereinafter "Condom Country") that offered condoms and other products for online purchase at a website through the URL http://www.ag.com/condom/country. |
| at least one buyer computer for operation by a user desiring to buy products; | Customers could access the Condom Country website using computers connected to the Internet and running a compatible web browser, such as Netscape. |
| at least one shopping cart computer; and | The Condom Country website server hosted the store website and permitted customers to select products to buy, which products were stored in a virtual shopping cart. |
| a shopping cart database | The Condom Country website stored the products |

| U.S. Patent No. 5,909,492 Claim 17 | Prior Art "Condom Country" Website |
|---|---|
| connected to the shopping cart computer; | the customer had selected and could display them on a "Shopping Bag" page. |
| the buyer computer and the shopping cart computer being interconnected by a public packet switched computer network; | Users could buy products from the Condom Country electronic store by using the World Wide Web connected via the Internet. |
| the buyer computer being programmed to receive a plurality of requests from a user to add a plurality of respective products to a shopping cart in the shopping cart database, and, in response to the requests to add the products, to send a plurality of respective shopping cart messages over the network to the shopping cart computer each of which comprises a product identifier identifying one of the plurality of products and at least one of which comprises a universal resource locator; | Once at the Condom Country website, the user could simply click a few buttons to add different uniquely-identified condom products to a virtual shopping cart (called a "shopping bag" on this website).  For example, as illustrated in the screen captures included above in this counterclaim, a buyer could click the "ADD THIS ITEM" button on a product page to add the product to the virtual shopping cart.  Then, after selecting different products on different product pages, the buyer could select the "View Bag" page to view the contents of the shopping cart. |
| the shopping cart computer being programmed to receive the plurality of shopping cart messages, to modify the shopping cart in the shopping cart database to reflect the plurality of requests to add the plurality of products to the shopping cart, and | The Condom Country electronic store modified the buyer's virtual shopping cart to reflect each addition and deletion from the customer's shopping cart.  When the buyer was ready to checkout, the Condom Country website presented the customer with a convenient summary of the order and an invitation to send the order. |
| to cause a payment message associated with the shopping cart to be created, the payment message comprising a universal resource locator; and | The Condom Country shopping cart computer caused a payment message associated with a shopping cart to be created.  For example, the Condom Country website included a series of web pages sent by the shopping cart computer to the customer to allow the customer to place an order for the products contained in his shopping cart.  Specifically, a series of web pages would be transmitted to the buyer computer to allow the customer to provide any needed shipping and payment information.  Once all of the necessary information had been collected for the order, the shopping cart computer sent a web page to the customer's computer that included an order button. |

29

| U.S. Patent No. 5,909,492 Claim 17 | Prior Art "Condom Country" Website |
|---|---|
| the buyer computer being programmed to receive a request from the user to purchase the plurality of products added to the shopping cart and to cause the payment message to be activated to initiate a payment transaction for the plurality of products added to the shopping cart; | The customer could then click the order button to place the order for the contents of the shopping cart. |
| the shopping cart being a stored representation of a collection of products, the shopping cart database being a database of stored representations of collections of products, and | The Condom Country "shopping bag" represented a collection of products that the customer had selected. The website stored such shopping carts for multiple customers. The customers could view their individual shopping bags by selecting the "View Bag" page. |
| the shopping cart computer being a computer that modifies the stored representations of collections of products in the database. | When a Condom Country customer added an item to his shopping bag, the server modified the customer's shopping bag to include the additional item. |

77.     On information and belief, Payne, Stewart, and Treese withheld information about Condom Country, the Condom Country website, their own use and testing of the Condom Country website, and that website's implementation of shopping carts from their patent attorney working on the '314 and '492 applications. The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

78.     The Condom Country website was not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 application.

79.     Payne, Stewart, and Treese committed inequitable conduct by not disclosing information about the Condom Country website and its public use to the Patent Office during the prosecution of the patents in suit. On information and belief, each of these individuals knew that the Condom Country website was a material reference, but withheld it with intent to deceive.

The evidence of the Applicants' knowledge of the materiality of the Condom Country creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for their failure to disclose.

80.      The Applicants' withholding from the Patent Office of their information about Condom Country, the Condom Country website, their own use and testing of the Condom Country website, and that website's implementation of shopping carts renders the '314 and '492 patents unenforceable.

### d. The Trewitt Paper and the Future Fantasy Bookstore Website

81.      Before joining Open Market, Payne, Stewart, and Treese worked for a company called Digital Equipment Corporation (also known as "DEC").  Payne and Stewart moved from DEC to Open Market in April 1994, and Treese followed in May 1994.

82.      Before the Applicants left DEC, that company was encouraging its employees to develop ideas and uses for the World Wide Web.

83.      While the Applicants were still at DEC, another DEC employee, Dr. Glenn Trewitt, followed this encouragement and designed a website for a Palo Alto, California science fiction bookstore called Future Fantasy Books (the "Future Fantasy website").  At least by February 1, 1994, the Future Fantasy website was accessible to the public and hosted on DEC servers.  The Future Fantasy website that was in public use at this time allowed customers to accumulate a plurality of books into a single order and then purchase by entering credit card and shipping information.

84.      In a March 1994 paper titled "Using Tcl to Process HTML Forms," Dr. Trewitt used his Future Fantasy website to illustrate a variety of concepts for conducting commercial

transactions over the Internet.  This paper is also known as TN-14, which refers to DEC Technical Note 14.  In general terms, Dr. Trewitt's paper described his methods to maintain "state" over the Internet during a user's interactions with a website.  Dr. Trewitt's paper also described the implementation of a shopping cart, explaining that the Future Fantasy website permitted users to shop by "browsing a catalog, accumulating a list of items, and then placing an order."

85.     On information and belief, Payne, Stewart, and Treese were aware of the Future Fantasy website and the TN-14 paper while they worked with Dr. Trewitt at DEC and after they went to Open Market.

86.     On information and belief, Treese and Payne had known about the Future Fantasy website at least by February 1994 when Dr. Trewitt sent an e-mail to the DEC internal mailing list WWWExperts with the subject "New Future Fantasy home page."  Trewitt's e-mail further included the URL for the Future Fantasy website:  [http://www.commerce.digital.com/palo-alto/FutureFantasy/home.html](http://www.commerce.digital.com/palo-alto/FutureFantasy/home.html).  On information and belief, one or more of the Applicants was on that DEC internal mailing list and received Dr. Trewitt's announcement.

87.     On information and belief, Payne and Treese learned of the TN-14 paper describing the Future Fantasy website at least by March 1994.  After finishing the TN-14 paper in early March 1994, Dr. Trewitt presented it at conferences at the DEC office in Boston in March 1994, where Payne, Treese, and Stewart all worked.  Payne and Treese attended the conference, and on information and belief, learned of TN-14 and its description of the Future Fantasy website's implementation of session IDs and shopping carts at this time.

88.     On information and belief, Stewart became aware of the Future Fantasy website at least by May 1994.  On or about May 8, 1994, Stewart sent an e-mail to Payne and Gifford with the subject "Notes of 5/6/94 Meeting at EDS" that named the Future Fantasy website as an example of early electronic commerce over the Internet.

89.     On information and belief, Treese retained a copy of the Trewitt paper when he left DEC to join Open Market in 1994.  In March 1995, a few months after filing the '314 application, Treese e-mailed Dr. Trewitt at DEC, admitting that he had taken a copy when he left DEC, confirming that it was not confidential, and seeking permission to make copies for others at Open Market:

> I have a copy of TN-14, dated March 1994.  It's not marked internal use only, so I kept it.  Was it officially issued by NSL?  Can we make copies of it (or get copies from you)?  It's quite good, and some of our new people could learn a lot from it.

90.     On information and belief, before filing the '314 application on October 24, 1994, Treese, Payne, and Stewart were each aware that the Future Fantasy website included an online shopping cart by which a customer could accumulate a plurality of books into a single order.  On information and belief, before filing the '314 application on October 24, 1994, Treese, Payne, and Stewart also were each aware that Dr. Trewitt's TN-14 paper described an online shopping cart by which a customer could accumulate a plurality of books into a single order.

91.     Because the Future Fantasy website implemented an online shopping cart, it was material to the patentability of one or more claims of the '314 patent and the '492 patent, including, for example, '314 patent claim 34 and the '492 patent claim 17.  For the same reason, Dr. Trewitt's TN-14 paper describing the Future Fantasy website and its shopping cart functionality was material to the patentability of at least those same claims.

92.     The Future Fantasy website and Dr. Trewitt's TN-14 paper were at least prima facie prior art that should have been disclosed to the Patent Office because they each would have resulted in the amendment or rejection of claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent Office, including, for example, the claims that issued as '314 patent claim 34 and '492 patent claim 17.

93.     In ex parte reexamination number 90/007,287, the Patent Office granted reexamination of the '314 patent based on Dr. Trewitt's TN-14 paper.  The Patent Office stated in pertinent part:

> It is agreed that Trewitt [TN-14] . . . raise[s] a substantial new question of patentability as to claims 34-39 [of the '314 patent] … Trewitt [TN-14] teaches creating an online bookstore using World-Wide Web protocols, including how to construct forms displayed by a browser that would pass uniform resource locators (*i.e.*, shopping cart messages) containing ISBN information for books (*i.e.*, product identifiers) to a web server for processing as part of an order.

94.     Later in the reexamination, the Patent Office described Dr. Trewitt's paper as among the "closest pieces of prior art of record in this reexamination proceeding."  The Patent Office permitted the '314 patent to emerge from this reexamination but only after assigning a narrow construction of the claims in view of the specification in which shopping cart messages had to include, *inter alia*, a "shopping cart URL authenticator that is a digital signature base on a cryptographic key."  That narrow construction has been advocated by several past defendants in lawsuits filed by Plaintiff, but to date, the district court has rejected that construction adopted by the Patent Office in favor of a broad construction successfully advocated by Plaintiff, including a construction of shopping cart message as meaning any "message concerning a shopping cart." Dr. Trewitt's TN-14 paper describes just such a message concerning a shopping cart, and the

Future Fantasy website in existence before October 24, 1994, likewise used a message concerning a shopping cart.

95.     On information and belief, Payne, Stewart, and Treese withheld information about the TN-14 paper, the Future Fantasy website, their own use of the Future Fantasy website, and that website's implementation of shopping carts from their patent attorney working on the '314 and '492 applications.  The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

96.     Dr. Trewitt's TN-14 paper and Future Fantasy website were not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 applications.

97.     On information and belief, Payne, Stewart, and Treese committed inequitable conduct by not disclosing information they possessed about the TN-14 paper, the public use of the Future Fantasy website, their own use of the Future Fantasy website, and that website's implementation of shopping carts to the Patent Office during the prosecution of the patents in suit.  On information and belief, each of these individuals knew that this information was material, but withheld it with intent to deceive.  The evidence of the Applicants' knowledge of the materiality of the TN-14 paper and Future Fantasy website creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for their failure to disclose.

98.     The Applicants' withholding from the Patent Office of the information they possessed about the TN-14 paper, the public use of the Future Fantasy website, their own use of the Future Fantasy website, and that website's implementation of shopping carts renders the '314 and '492 patents unenforceable.

35

### e. Stuff.com

99.     In early 1994, a company called Palantir began developing an e-commerce website at www.stuff.com ("Stuff.com") to offer products for sale via the Internet.  By June 1994, the Stuff.com website was available to the public to select and purchase t-shirts.  On June 14, 1994, Stuff.com announced its website through a public mailing list called WWWORDER.

100.     The Stuff.com website of June 1994 included an online shopping cart to contain items selected by the user during a shopping session.  Testifying under oath at a deposition on March 21, 1995, one of the Stuff.com founders—Scott Boake—described the website's shopping cart as follows:

> Well, the concept was just like a shopping cart that you'd have at a store.  You push -- you know, you walk around through the store.  You take items that you're going to purchase, put them in a shopping cart.  This happens to be a virtual collection, a virtual container that kept track of what you wanted to take and purchase.

101.     Also testifying under oath, Michael Kuniavsky, the developer of the separate HotHotHot website, and thus a disinterested witness, recalled visiting the Stuff.com website and described its shopping cart functions:

> Stuff.com had an early -- had a -- had a very early -- early shopping cart mechanism, for lack of a better term.  They had an early mechanism to maintain state and to allow people to create a – to essentially click through several pages and maintain something that was a list of things that they were interested in that the system would maintain from page to page.

102.     On information and belief, by June 15, 1994, one day after the announcement by Stuff.com of the website launch, Payne had already learned about Stuff.com, had visited the website, and had sent a report of his experience to his co-workers, including Treese and Stewart.  Specifically, Payne learned about the Stuff.com website from an e-mail he received from einet.com on or about June 15, 1994, which published the location of the Stuff.com website and

indicated that the website was selling T-shirts.  Payne then investigated the Stuff.com website that same day.

103.    On information and belief, on June 15, 1994, Payne reported the results of his investigation to Treese and Stewart in an e-mail.  Payne's e-mail to his colleagues described a website that was selling clothing to the public in 1994 using the domain name Stuff.com.  Payne also wrote that the website had "an option to take the credit card numbers over the net."

104.    On information and belief, at least by October 24, 1994, when the '314 "shopping cart" application had been filed, Payne, Stewart, and Treese had knowledge that the Stuff.com website had an implementation of an online shopping cart.

105.    On information and belief, at least by October 24, 1994, when the '314 "shopping cart" application was filed, at least Payne had personally navigated through the Stuff.com website and tested some or all of its features.

106.    Because the Stuff.com website implemented an online shopping cart, it was material to the patentability of one or more claims of the '314 patent and the '492 patent, including, for example, '314 patent claim 34 and the '492 patent claim 17.

107.    The Stuff.com website was at least prima facie prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent Office, including, for example, the claims that issued as '314 patent claim 34 and '492 patent claim 17.

108.    On information and belief, Payne, Stewart, and Treese withheld information about Stuff.com, the Stuff.com website, their own use and testing of the Stuff.com website, and that

website's implementation of shopping carts from their patent attorney working on the '314 and '492 applications. The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

109.    The Stuff.com website was not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 application.

110.    Payne, Stewart, and Treese committed inequitable conduct by not disclosing information about the Stuff.com website and its public use to the Patent Office during the prosecution of the patents in suit. On information and belief, each of these individuals knew that the Stuff.com website was a material reference, but withheld it with intent to deceive. The evidence of the Applicants' knowledge of the materiality of the Stuff.com website creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for the failure to disclose.

111.    The Applicants' withholding from the Patent Office of their information about Stuff.com, the Stuff.com website, their own use and testing of the Stuff.com website, and that website's implementation of shopping carts renders the '314 and '492 patents unenforceable.

### f. Internet ShopKeeper

112.    Internet ShopKeeper software was developed by Internet Presence and Publishing ("IPP") in 1994. Internet ShopKeeper allowed clients to create online stores that would be hosted on a computer provided by IPP. The stores were accessible at the URL http://www.ip.net/shops.html.

113.    On August 2, 1994, IPP issued an announcement on public computer newsgroups, including comp.infosystems.www.users, describing the Internet ShopKeeper technology.

> The Internet ShopKeeper is the World's first World Wide Web based user
> extensible virtual mall.  The Internet ShopKeeper provides a place in
> cyberspace where people from around the world can setup and manage
> their own shops.
>
>                \* \* \*
>
> When someone sets up a shop, he or she has the ability to do the
> following at anytime:
> - o Manage his/her shop's complete inventory.
>   - Change inventory names
>   - Change inventory prices
>   - Change inventory descriptions
> - o Change the Shop's name
> - o Change the shop's Description

114.    Internet ShopKeeper was similar to a product that Open Market was also developing in 1994 called StoreBuilder, which included software permitting customers to build and manage their own web storefronts that were hosted by Open Market.  In addition to their claims regarding online shopping carts, the Applicants included in the '314 and '492 applications other claims to concepts in their StoreBuilder product for creating online stores.  For example, '492 patent claims 1-5 address the concept from the StoreBuilder product of using a "creation computer" to build a database of products and product advertisements and the "merchant computer" then to transmit the product advertisements to a purchaser.  The Applicants included StoreBuilder source code as an exhibit to the '314 and '492 applications.

115.    Internet ShopKeeper was particularly material to claims in the '314 and '492 patents that related to Open Market's StoreBuilder product, such as claims 1-5 of the '492 patent.  Open Market, including at least Payne and Treese, knew this.

116.    On information and belief, in July 1994, Keith Basil of IPP posted a message to the public WWWORDER mailing list requesting beta testers for Internet ShopKeeper.  This message stated, "I have written a WWW application package that allows anyone using the Web

to setup a shop, manage the inventory (price, description, and item name) and setup information for their own personal shops.  It has complete online ordering forms that are dynamically built upon item selection."  Payne forwarded Basil's post to others at Open Market with the comment "Can you say StoreBuilder?"—clearly referring to Open Market's StoreBuilder product then still only in early development.

117.    On information and belief, on or about July 28, 1994, Treese forwarded Basil's post about Internet ShopKeeper to others at Open Market under the subject "A competitor for Store Builder?"

118.    On information and belief, on or about August 2, 1994, Stewart sent an e-mail to [all@openmarket.com](all@openmarket.com) with the subject "Internet Shopkeeper" and stating: "Is essentially Store Builder.  See [http://www.ip.net/](http://www.ip.net/)."

119.    On information and belief, on August 11, 1994, Gail Grant sent an e-mail to all@OpenMarket.com with the subject "http://www.ip.net/shops.html" stating, "Hmm. Looks ALOT like storebuilder. And their rates are VERY low."

120.    On information and belief, on that same day, Payne responded to Grant's message about Internet ShopKeeper with an e-mail that included the text "Yep, they've been on our radar screen for a while. I've told Shikhar and Kim about the ShopKeeper several times, but they seem too busy to care.  Or maybe they do care, but it doesn't worry them."

121.    On information and belief, on that same day, Stewart responded to Grant's message with an e-mail that included the text "Yep, we knew about that one too.  We're positioning Store Builder at the 'up to 200 items' market.  We'll see."

122.    On information and belief, the website for Internet ShopKeeper was also registered with the Commercial Sites Index that Open Market operated during the prosecution of the '314 and '492 applications.

123.    On information and belief, at least by October 24, 1994, when the '314 application had been filed, Payne, Stewart, and Treese had knowledge that Internet ShopKeeper was very similar to Open Market's StoreBuilder product.

124.    Because Internet ShopKeeper provided functionality for building a merchant database using a creation computer and other online commerce website functionality, it was material to the patentability of one or more claims of the '314 patent and the '492 patent, including, for example, claim 1-5 of the '492 patent.

125.    Internet ShopKeeper was at least prima facie prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent Office, including, for example, the claims that issued as '492 patent claims 1-5.

126.    On information and belief, Payne, Stewart, and Treese withheld information about Internet ShopKeeper from their patent attorney working on the '314 and '492 applications.  The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.

127.    Internet ShopKeeper was not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 application.

128.    On information and belief, Payne, Stewart, and Treese committed inequitable conduct by not disclosing information about Internet ShopKeeper and its public use to the Patent

Office during the prosecution of the patents in suit.  On information and belief, each of these individuals knew that Internet ShopKeeper was material to patentability of the '314 and '492 applications, but withheld it with intent to deceive.  The evidence of the Applicants' knowledge of the materiality of Internet ShopKeeper creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for the failure to disclose.

129.    The Applicants' withholding from the Patent Office of their information about Internet ShopKeeper renders the '314 and '492 patents unenforceable.

### g.  The First Virtual System

130.    First Virtual Holdings was a company formed in early 1994 to facilitate Internet commerce.  The first product offering from First Virtual was an Internet payment transaction system (the "First Virtual system"), which was publicly announced as a fully operational open Internet service on October 15, 1994.

131.    The First Virtual System is prior art that should have been disclosed to the Patent Office because it would have resulted in the amendment or rejection of claims that Applicants were seeking to obtain in the '314 and '492 applications.  This materiality of the First Virtual system to the '314 and '492 applications is confirmed by actions the Patent Office made in later, related applications rejecting nearly identical claims as those in the '314 and '492 applications.

132.    Specifically, on May 5, 1999, Applicants filed a continuation application, Serial No. 09/304,723, which claimed priority to the '314 and '492 applications.  That '723 application later issued in 2002 as U.S. Patent No. 6,449,599.  During the prosecution of the '723 application, but notably after both the '314 and '492 patents had been issued, the Applicants disclosed to the Patent Office a document dated April 11, 1994 describing the First Virtual system (the "1994

42

Allen document"). After reviewing the 1994 Allen document, the Examiner expressly found that

the document rendered obvious a number of pending claims, including application claim 35.

This claim was addressed to a "network-based sales system" including a buyer, merchant, and

payment computer, and stated:

> 35. A network-based sale system, comprising:
> at least one buyer computer for operating by a user desiring to buy a product;
> at least one merchant computer; and
> at least one payment computer;
> the buyer computer, the merchant computer, and the payment computer being interconnected by a public packet switched computer network;
> the buyer computer being programmed to receive a user request for purchasing a product, and to send a payment message to the payment computer that comprises a product identifier identifying the product;
> the payment computer being programmed to receive the payment message, to cause an access message to be created that comprises the product identifier and an access message authenticator based on a cryptographic key, and to cause the access message to be sent to the merchant computer; and
> the merchant computer being programmed to receive the access message, to verify the access message authenticator to ensure that the access message authenticator was created using the cryptographic key, and to cause the product to be sent to the user desiring to buy the product.

133.   As part of this rejection, the Examiner explained:

Allen discloses a network-based sale system, comprising at least one buyer computer for operation by a user desiring to buy products (e.g., pages 6-7); at least one merchant computer (pages 6-7); and at least one payment computer (pages 6-7) .... Allen further discloses that the buyer computer is programmed to receive a user request for purchasing a product, and to send a payment message to the payment computer that comprises a product identifier identifying the product (page 7, last four paragraphs).

134.   Rejected claim 35 of the '723 application was nearly identical to at least claim 1

in the '314 patent and at least claim 19 of the '492 patent. For example, the only differences

between rejected claim 35 of the '723 application, '314 patent claim 1, and '492 patent claim 19 are the following trivial changes:

| '723 Application –Claim 35 (Rejected) | '314 Patent – Claim 1 | '492 Patent – Claim 19 |
| --- | --- | --- |
| public packet switched computer network | computer network | computer network |
| send a payment message to | causing a payment message to be sent | causing a payment message to be sent |
| verify the access message authenticator | verify said access message authenticator | cause the access message authenticator to be verified |
| cause the product to be sent to the user | cause said product to be sent to the user | cause the product to be received by the user |

135.    Given the nearly identical nature of these claims, the Patent Office would have rejected at least claim 1 of the '314 patent and claim 19 of the '492 patent if it had been shown the 1994 Allen document describing the First Virtual system during the prosecution of the '314 and '492 applications.

136.    On information and belief, each of the Applicants knew of the 1994 Allen document and the First Virtual system it described before filing the '314 application.  For example, Treese read an October 15, 1994 posting by Nathaniel Borenstein of First Virtual describing the First Virtual system.  That same day, Treese communicated his analysis of the First Virtual system to at least Payne and Stewart in an e-mail to notices@openmarket.com.  This was over a week before filing the '314 application.

137.    Nine months later, in July 1995, the three Applicants published a paper titled "Payment Switches in Open Networks" (the "Payment Switches Paper").  *See* http://static.usenix.org/publications/library/proceedings/ec95/full_papers/gifford.txt/.  In the Payment Switches Paper, the Applicants described Open Market's work with online payment

systems, including their process of using a buyer computer, merchant computer, and payment computer to pass various messages for payment processing, just like the system set forth in '314 patent claim 1 and '492 patent claim 19.  The Payment Switches Paper also described the use of a shopping cart in collecting items for purchase.  The Applicants also admitted in the Payment Switches Paper that "[t]he First Virtual payment system is the closest to our approach."

138.    On information and belief, at least by October 24, 1994, when the '314 application had been filed, Payne, Stewart, and Treese had knowledge of the 1994 Allen document describing the First Virtual payment system.

139.    On information and belief, at least by July 1995, Payne, Stewart, and Treese believed that the First Virtual payment system was the closest to Open Market's own payment system.

140.    The First Virtual payment system and the 1994 Allen document were at least prima facie prior art that should have been disclosed to the Patent Office because they would have resulted in the amendment or rejection of claims in the '314 and '492 applications that the Applicants were seeking to obtain in the Patent Office, including, for example, the claims that issued as '314 patent claim 1 and '492 patent claim 19.  This fact is confirmed by the Patent Office's later rejection of nearly identical claims in the related '723 application discussed above.

141.    On information and belief, Payne, Stewart, and Treese withheld information they possessed about the First Virtual payment system and the 1994 Allen document from their patent attorney working on the '314 and '492 applications.  The Applicants also never disclosed any of this information to the Patent Office during the prosecution of the '314 and '492 applications.  Further, no other person involved in the prosecution of the patent applications in question ever

45

informed the Patent Office of the functionality of the First Virtual payment system as described in the 1994 Allen document.

142.     The First Virtual system and the Allen document were not cumulative to any other prior art before the Patent Office during the prosecution of the '314 or '492 application.

143.     Payne, Stewart, and Treese committed inequitable conduct by not disclosing the 1994 Allen document and all of the other information they possessed about the First Virtual payment system to the Patent Office during the prosecution of the patents in suit.  On information and belief, each of these individuals knew that the First Virtual system and the 1994 Allen document were material references, but withheld them with intent to deceive.  The evidence of the Applicants' knowledge of the materiality of the First Virtual system and the 1994 Allen document creates a reasonable inference of intent to deceive and is incompatible with any innocent explanation for the failure to disclose.

144.     The Applicants' withholding from the Patent Office of their information about the 1994 Allen document and the First Virtual payment system renders the '314 and '492 patents unenforceable.

**h.  Additional Evidence of Inequitable Conduct Not Available at this Time**

145.     On information and belief, additional evidence of the Applicants' detailed knowledge in 1994 of the HotHotHot website, the NetMarket website, the Condom Country website, the Trewitt Paper and Future Fantasy Bookstore website, the Stuff.com website, Internet Shopkeeper, and the First Virtual system, as well as the Applicants' knowledge of the materiality of each of these to the shopping cart or other claims of the '314 and '492 applications, is contained in a number of documents filed under seal and/or designated confidential by Plaintiff

46

in Case No. 6-04CV14, including at least summary judgment materials (*e.g.*, Dkt. Nos. 337-343, 379, 382-387), Plaintiff's production documents, and the depositions of the Applicants and David Gifford.  Because the Counterclaim-Plaintiffs do not yet have access to those sealed materials and because Plaintiff's current counsel has refused to immediately produce documents from prior cases involving the Asserted Patents, the Counterclaim-Plaintiffs are unable to include these additional sealed facts in this counterclaim at this time and reserve the right to amend this pleading with those additional facts once a protective order is in place and Counterclaim-Plaintiffs' counsel is given access to these additional materials that further establish inequitable conduct.

JURY DEMAND

Counterclaim-Plaintiffs demand a trial by jury of all issues so triable.

PRAYER FOR RELIEF

Counterclaim-Plaintiffs respectfully request that this Court enter judgment in their favor and grant:

a) an order and judgment declaring that Counterclaim-Plaintiffs do not infringe any valid and enforceable claim of the patents-in-suit;

b) an order and judgment declaring that the claims of the patents-in-suit are invalid;

c) an order and judgment declaring that the claims of the patents-in-suit are unenforceable due to inequitable conduct;

d) an order and judgment that Soverain is not entitled to any relief arising from its First Amended Complaint against Counterclaim-Plaintiffs and dismissing Soverain's First Amended Complaint with prejudice;

e)  an order and judgment declaring this an exceptional case and awarding Counterclaim-

Plaintiffs their reasonable attorneys' fees and costs in accordance with 35 U.S.C. §

285;  and

f)  any other relief that the Court may deem appropriate and just under the circumstances.


Respectfully submitted on November 9, 2012.

       _s/Clayton C. James_____
Clayton C. James
Srecko Vidmar
HOGAN LOVELLS LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
(303) 899-7300 (phone)
(303) 899-7333 (fax)
clay.james@hoganlovells.com
lucky.vidmar@hoganlovells.com

*Attorneys for Defendants Oracle Corporation,*
*Oracle OTC Subsidiary LLC, Best Buy Co., Inc.,*
*BestBuy.com LLC, Neiman Marcus, Inc., The*
*Neiman Marcus Group, Inc.,*
*BergdorfGoodman.com, LLC, and OfficeMax, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2012, I electronically filed the foregoing

**DEFENDANTS' FIRST AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS**

**TO PLAINTIFF'S AMENDED COMPLAINT** using the Court's CM/ECF system which will

electronically serve the same upon all counsel of record.


*s/Srecko Vidmar*
Srecko Vidmar

49